IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MALCOLM MEDLEY,<br><br>   *Plaintiff,*<br><br>v.<br><br>CHARLOTTE A. BURROWS, CHAIR,<br>U.S. EQUAL EMPLOYMENT OPPORTUNITY<br>COMMISSION,<br><br>   *Defendant.* | Civil Action No.: 1:21-cv-0534-RC |

**PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

   In its Opposition to Plaintiff's Motion, the Agency attempts to justify Medley's removal from the Senior Executive Service by showing the ways in which he was excluded from fulfilling the responsibilities of his role solely based on his race. The Agency also attempts to argue that Medley is at no risk of harm despite the imminent risk of his transfer to in-person work across the country.

   The Agency's arguments are unavailing. As Medley lays out in his Complaint, now substantiated by several witnesses, Inzeo systematically excluded Medley from his role by excluding him from relevant calendar invites and emails, causing Medley to be completely sidelined from his work, based on nothing more than the color of skin.   Further, the Agency can transfer Medley to a remote position at any time, and tellingly, refused to stipulate that the Agency would not require Medley to report in-person during the pendency of his legal claims.

1

In short, the Agency's Opposition does not change the fact that Medley has meritorious claims and is at imminent danger of his entire life being uprooted in the middle of a global pandemic. The Court should therefore grant Plaintiff's Motion.

## STATEMENT OF ADDITIONAL FACTS

*Medley's Performance at EEOC*

In 2009, Kessela Reis began working for Medley at the EEOC Miami, Florida District Office, where he substantially improved the overall District Office performance. *See* Exhibit 1, Declaration of Kessela Reis, at ¶ 3-5. In 2015, Reis returned to EEOC after working for the U.S. Securities & Exchange Commission and once again worked under Medley. *See* Exhibit 1 at ¶ 6. There, Reis enjoyed working with Medley and enjoyed his style of management. *Id*.

*EEOC Discriminates against Medley*

Reis noticed that Inzeo was treating Medley differently based on Medley's race. *See id*. at ¶ 7. Specifically, Inzeo acted dismissive and condescending toward Medley, frequently speaking to him in a negative tone and dismissing all of Medley's suggestions. *See id*. at ¶ 8. Reis witnessed Inzeo leaving Medley out of communications to his subordinates and communicating with them directly. *See id*. at ¶ 9. Inzeo would also schedule meetings with Medley's subordinates without Medley, only inviting Medley at the last minute. *Id*. Overall, Inzeo prevented Medley from doing his job by isolating him from the rest of the office. *Id*.

Reis also noticed an evident racial element to Inzeo's treatment of Medley, as he would treat Medley as a GS-14 or GS-15 rather than treating him as the Senior Executive Service (SES) manager that he was. *See id*. at ¶ 10. However, Inzeo treated Medley's white peers, Michael Dougherty and Martin Ebel, as the SES members they were. *Id*. They were all "buddies," except for Medley. *Id*.

*Reis Reacts to Inzeo's Treatment of Medley*

Reis witnessed the March 12, 2021 incident in which Inzeo yelled at Medley for being proactive in contacting the Office of Information Technology in anticipation of the EEOC's handling of the COVID-19 pandemic. *See* Dkt. 1 at ¶ 14-15; Exhibit 1 at ¶ 11. Reis was shocked, offended, and surprised at the manner in which Inzeo yelled at Medley and decided to hold Inzeo accountable by sending the attendees of the March 12, 2021 meeting an email documenting it. *See* Exhibit 1 at ¶¶ 12-13. Medley pleaded with Reis not to send it, telling her "You will destroy your career. Please do not do it." *Id*. at ¶ 14. Reis understood that Medley preferred to avoid confrontation but felt that she would be letting Inzeo get away with it if she did not do something about it; she sent the email. *Id*. at ¶¶ 14-15.

The subject line of the email was titled "Yelling on today's call." In the email, Reis wrote:

> Towards the end of today's call, Nick decided to yell at Malcolm (twice) as if he were a child while he attempted to participate in this "Brainstorming" session simply because he did not agree with him or his suggestions to work with [OIT] to help explore leveraging technology to provide training during this Pandemic. Everyone present in the room and on the call remained silent and the call continued as if nothing happened. Maybe you all were in shock or paralyzed in thought on what to do or say.
>
> As a black woman to have to witness a white man unrestrained and indignant yell at a black man for attempting to do his job by simply participating in a meeting marked as "brainstorming" is intolerable, disrespectful, and outrageous.
>
> Silence only condones and sends a clear message that this behavior is okay and allowable. It is not okay as it wreaks of racism, fealty, and at minimum unprofessionalism. It undermines and makes a complete mockery of the legislation this agency is to uphold.

Exhibit 2, Email from Reis to OFP Senior Staff, at 1. Reis ended her email by stating that she would not be a bystander and by including an Angela Davis quote regarding the systemic racism in modern-day American society. *See* Exhibit 2 at 2.

The responses were insightful. While Calvin Loving did not "see the incident from a racial point of view," he did state that he "does not hold [Inzeo] in high esteem" and that:

> One thing true leaders do not do is to dress down a ranking member of their staff in front of subordinates when an offline discussion would accomplish the desired result. [Inzeo] is no leader nor is he a manager. I thought that [Inzeo] irresponsibly thrashed [Medley] for taking initiative and made him look foolish in front of the staff. For those with real character, they saw the fool was [Inzeo].

Exhibit 2 at 3. Janet Cook Canary answered one hour later and stated that she did not hear any yelling, just irritation because Medley or Reis had reached out to OIT without permission from Inzeo. *See* Exhibit 2 at 4. Reis believes that Cook Canary's answer was coached by Inzeo. *See* Exhibit 1 at ¶ 17.

*EEOC Attempts to Retaliate Against Reis and Targets Medley Instead*

In or around June 2020, Reis learned from Medley that Inzeo had attempted to have Medley report Reis to the Office of the Inspector General. *Id*. at ¶ 18. She immediately prevented Inzeo from retaliating against her by working for the Chair's Vulnerable Worker Task Force, away from his influence. *Id*. at ¶ 19.

Reis subsequently learned of Dhillon's lowering of Medley's 2020 performance rating from "3" to "1" from Medley. *Id*. at ¶ 20. Dhillon's action is unusual because she is not involved day-to-day with the work of SES members and usually approves anything the rating official and the Peer Review Board issues. *Id*. at ¶ 21. Reis also knew that Dhillon had no knowledge of Medley or his work well enough to take a strong position on his performance. *Id*. at ¶ 23.

Reis also found it strange that Dhillon partly justified lowering Medley's rating based on his stepping down from the Chair's Vulnerable Worker Task Force, the same task force that Reis worked on for seven months to avoid Inzeo's retaliation. *Id*. at ¶¶ 19 & 22. Reis found this to be

4

strange because several other task force members had also stepped down without it being held against them, specifically Tim Riera (GS-15) and Patricia St. Clair (GS-15). *Id*. at ¶ 22.

## ARGUMENT

This Court should grant Medley's motion for a preliminary injunction because: (1) the Agency can and will force Medley to report to New Orleans in person at any time and refuses to stipulate otherwise; (2) Medley still has a particularly strong likelihood of success on the merits of his claims; (3) the balance of equities continues to tip decidedly in Medley's favor; and (4) the public interest still weighs in favor of granting Medley relief.

**I. Medley can show certain and imminent irreparable harm because the Agency can and will force Medley to report to New Orleans in person at any time and refuses to stipulate otherwise.**

**A. The Agency will order Medley to report to his new position in person.**

The Agency argues at length that Medley's removal from the SES and transfer to his current position are not irreparable harms while also simultaneously arguing that such actions are outside of the scope of this Motion since both have already occurred. The Agency does not, however, address the remaining harm that will befall Medley without the Court's intervention: having his remote work status revoked by the Agency and being forced to report across the country in person during a global pandemic. Medley understands that the Court cannot alter the *status quo* and does not imply otherwise – he now asks for the Court to grant this Motion to prevent the Agency from ordering him to work remotely.

Importantly, the Agency fails to mention that counsel for Medley attempted to contact Agency counsel *before* he filed his motion and requested an extension of the effective date of his removal from SES. The Agency granted an initial extension and later refused to grant further extensions, causing Medley to file his motion for injunction on the same day his removal took

place.  Had Medley refused to accept the new position from New Orleans, he would have lost his job entirely.

Despite the Agency's claims otherwise, the harm against Medley is both certain and imminent because the Agency (1) will certainly revoke its COVID-19 policy when it finds such action appropriate, and (2) the lack of precise knowledge of when this will occur does not make it any less certain. The EEOC's revocation of its COVID-19 policies is not something that will occur "at some indefinite time," but is rather an actual and non-theoretical threat against Medley that can occur at any time. *Clarke v. Off. of Fed. Housing Enter. Oversight*, 355 F. Supp. 2d 56, 65; *see also Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curium*).

The Agency seeks to, at any time it wishes, order Medley to report to work in-person in New Orleans, putting him at greater risk of harm during a global pandemic by requiring him to travel across the country. It is indisputable that the Agency will force Medley to report to New Orleans in person upon the termination of its COVID-19 policy allowing remote work. While the exact timing of the revocation of this policy is not certain, this does not reduce the certainty of the action itself. The threat to Medley is still of such imminence that the need for relief remains clear and present. It is in fact the very uncertainty of when Medley will be forced to report across the country during a global pandemic that intensifies the clear and present danger of the threat – it can happen at any time, thus necessitating equitable relief as soon as possible.

Setting aside the health concerns associated with the global pandemic, the Agency's decision requires Medley to relocate his entire life and family across the country for this new position.  While the Agency touts that Medley is still employed and making the same salary, it ignores the immense and immediate strain it places on Medley and his family – an action that Medley believes is rooted in illegal discrimination.  Thus, the injury is very certain to occur and

is not theoretical – but rather is a clear and present threat of harm that will take place unless this Court enjoins the Agency.

The Agency's use of Ebel's declaration to show that Medley is not in danger of such a transfer does not address the clear and present danger of harm: Ebel is merely pointing out that the EEOC has a COVID-19 policy that does not require any in-person work *yet*. *See* Defense Ex. 2 at ¶ 9 ("[Medley] will not be required or expected to relocate for *as long as the Commission remains on 100% telework status*.") (emphasis added). This is exactly the point of this Motion: The Agency is free to modify or cancel its 100% telework status at any time and will do so when it believes such action is appropriate. While there is certainty that the Agency will revoke its policy, regardless of when that occurs, what is not certain is whether Medley will be safe when that occurs – the Agency will therefore be placing Medley at great risk of irreparable harm. This is magnified by the fact, as will be discussed below, that the Agency refused to stipulate to preserving Medley's current 100% telework status until the adjudication of his claims, despite Medley offering to rescind this Motion in exchange. *See* Exhibit 3, Email re: Refusal to Stipulate.

**B. The Agency ordering Medley to travel across the country during a global pandemic is an irreparable harm.**

Despite the Agency's arguments, there is little in *Sampson v. Murray* to counter the fact that, while an ordinary transfer over great geographic distances by the government may not overcome the rigorous standard set, a transfer during or even at the tail-end of a global pandemic represents much greater risk to the transferee. 415 U.S. 61 (1974). This risk is not of mere economic or compensatory damages that can easily be redressed by any court, but the risk of contracting a virus that still evades 100% efficient treatment, despite the existence of vaccines. *Sampson* requires "extraordinary circumstances" to make a showing of an irreparable injury in

the context of federal employee plaintiffs. *Id*. Risk of contracting COVID-19 through travel from Boston to New Orleans followed by reporting to work physically in New Orleans is such an "extraordinary circumstance."[1] *Id*. This is especially true for Medley and his spouse, who are both have diabetes and therefore at greater risk of harm from COVID-19.[2]

The Agency's only argument against this is to rely on Medley and the Court's trust that it will only revoke its 100% telework policy only when it is safe. <u>This trust is severely in question.</u> When Medley offered to rescind this Motion in exchange for a stipulation that Medley would continue to work from home even after the revocation of EEOC's 100% telework policy, *the Agency refused*. *See* Exhibit 3. The Agency refused to dispense of this Motion specifically to preserve its power to transfer Medley across the country in the middle of a global pandemic. *Id*. The Agency refused this stipulation despite Medley's good-faith offer to drop his request to have his SES status and previous position returned to him – he merely asked for safety while working in his current GS-15 position and the Agency refused. *Id*.

Finally, the Agency argues that Medley cannot rely on *Bonds v. Heyman,* 950 F. Supp. 1202, 1214-15 (D.D.C. 1997), *Neal v. Dep't of Corr.,* 1996 U.S. Dist. Lexis 7967, at *10 (D.D.C. 1996) and *Segar v. Civiletti,* 516 F. Supp. 314, 320 (D.D.C. 1981) - to support his contention that retaliation is an irreparable harm. The Agency's argument here again attempts to obfuscate the fact these cases apply here by that Medley's retaliation claims are not meritorious. Because, as will be discussed, Medley's retaliation claims are meritorious, they are irreparable harms on both Medley and any future employee seeking to report discrimination or engage in

---

[1] Medley also meets the *Wisconsin Gas* standard as laid out in his Motion.
[2] The move from Boston/Washington DC to New Orleans places Medley at risk regardless of EEOC's pandemic-related policies, as Medley will be unable to oppose any change in EEOC's policies in the future. Further, *any* travel to New Orleans is a risk compared to Medley working in Massachusetts (as he has been working from home and not traveling).

any other protected activity. *See EEOC v. Cosmair, Inc.*, 821 F.2d 1085, 1090-91 (5th Cir. 1987).[3] Since the EEOC's violation of civil rights laws coupled with its imminent damage to Medley's and health in a manner that could not be remedied solely with monetary damages, Medley is able to show that he will suffer irreparable harm.

II. **Medley has a particularly strong likelihood of success on the merits of his claims because the Agency's "unfavorable" information merely reflects Inzeo's actions against Medley and because Medley has no obligation to administratively exhaust while seeking to enjoin retaliatory actions.**

Despite the Agency's claims of unfavorable information and bars to Medley's civil action, Medley continues to have a strong likelihood of success on the merits on his claims. In showing a strong likelihood of success, Medley need not prove his case in full, *i.e.,* by a preponderance of the evidence. *See University of Texas v. Camenisch,* 451 U.S. 390, 395 (1981). First, the information the Agency included is not unfavorable to Medley's claims, but a core part of them. Second, Medley need not administratively exhaust as long as he is seeking to enjoin the Agency from taking retaliatory actions.

A. **The Agency's "unfavorable" information merely reflects Inzeo's actions against Medley.**

The Agency cites to various examples of disparate treatment against Medley as if they were "facts omitted from the Complaint" that would "render Plaintiff unlikely to succeed on the merits." *See* Dkt. No. 9 at 12. First, these facts are not omitted. Medley clearly laid out in his Complaint and his Motion that the Agency alleged that Medley's performance was lacking. Second, each of the facts the Agency believes undermine Medley's claims actually bolster them:

---

[3] The Agency argues against this case as being out-of-circuit. This is why Medley included several on-point cases from this Circuit as well. Further, this case has strong persuasive authority, showing that retaliation as an irreparable harm is not merely an easy way to obtain an injunction – but a powerful means of ensuring that the underlying statute remains relevant.

the perception that Medley was not an adequate performer can be directly linked to Inzeo's successful isolation of Medley from his own work and his subordinates.

The Agency first refers to Dhillon complaining that Medley "withdrew from an assignment from [his] direct supervisor to participate on the Agency's Vulnerable Workers' Taskforce." Dkt. 9-1 at 1. Medley and several others withdrew from this assignment in order to prioritize their respective roles. *See* Exhibit 2 at ¶ 22. Only Medley was disciplined for this. *Id*. The Agency's use of this fact is undermined by the fact Medley was disparately punished for this action, while others were not.

Next, the Agency references that Medley "did not meaningfully participate in or support [the Chair's] initiative that introduced a pilot program to expand the agency's mediation services…" and "sought to exclude a member of [his] staff from participating on the Taskforce." *Id*. The Agency could not muster anything more in argument than to state that Medley said the opposite in his Complaint, that Medley was excluded from taking part in such tasks by Inzeo, and had his subordinates controlled by Inzeo as well. *See* Dkt. 9 at 12-13. The Agency's only accomplishment here is to admit that it has no further proof of its own claim as Medley does.

The Agency then directly addresses the result of Inzeo's actions: that Medley was unable to or unaware of a variety of tasks and meetings that he was meant to attend. *See* Dkt. 9 at 13. Seemingly ignoring that Medley addressed all of this in his Complaint and Motion, the Agency lays out every way in which Inzeo kept Medley from doing his job. *Id*. Medley failed to arrive at meetings or showed up late because Inzeo prevented Medley from knowing about these meetings. Medley did not deliver on his assignments because Inzeo deliberately sought to exclude Medley from knowing what tasks he was responsible for or preventing him from accomplishing those tasks when they were known about through selective denial of requests for

budget allocations or decision-making authority. That other employees at EEOC noticed that Medley was not able to do his job has little bearing on the merits of his claims. Rather – they are proof that Inzeo set Medley up to fail by intentionally managing Medley's subordinates without Medley, atrophying Medley's post.

Finally, Medley addressed the reprimand he received from Ebel in his complaint. The reason Medley failed to complete his report on time was because he had been isolated from his work by Inzeo for so long that he was not in a position to summarize all of his office's accomplishments – he was not involved in any of them because of Inzeo's discrimination. That other SES level managers under Inzeo's supervision, none of whom are black to Medley's knowledge, did not have this issue speaks to the merit of Medley's claims.

Medley's Complaint as well as testimony from Reis address this and every other claim of deficient performance from Medley, as does the fact that Medley performed well when given the chance to, such as at the Miami, Florida District Office.

While the Agency does not make any attempts at legal argumentation to undermine Medley's claims, only stating facts it believes are unfavorable, the Agency is attempting to bolster its legitimate business reason for terminating Medley by alleging that his work performance justified his removal from the SES. As stated in Plaintiff's Motion, the facts that the Agency brings here are merely pretext for discrimination and retaliation.

Inzeo's performance narrative was retaliation for Medley's protection of Reis from retaliation and intentionally cast Medley as a deficient performer. Dhillon's letter seized upon these alleged facts with specificity she is unlikely to know about. *See* Exhibit 2 at ¶ 22. Finally, Ebel's reprimands were based on work Medley could not be expected to do considering how

isolated he had been from performing his own work. By bringing up these facts, the Agency merely bolsters Medley's pretext argument, showing that his claim still has merit.

### B. Medley has no obligation to administratively exhaust while seeking to enjoin retaliatory actions.

The Agency's other argument against Medley's claims is procedural in nature, essentially stating that Medley should not have appeared in this Court at all until he fully administratively exhausted his claims – a process that can take up to one year to complete and could therefore prevent Medley from attempting to preserve his current remote work *status quo*. The public policy issue with the Agency's legal position is fraught – it would force a victim of retaliation to allow their employers to fully carry out their actions before one could petition any adjudicative body, be it the EEOC or this Court.

This public policy issue was, fortunately, solved in 1987 by the D.C. Circuit in *Wagner v. Taylor*, where it stated, "Federal courts have the authority to enjoin, when appropriate, retaliatory transfers and other acts of reprisal while the administrative or the judicial-review process is advancing." 836 F. 2d 566, 570-71 (D.C. Cir. 1987). The Court specifically noted that Congress did not intend to foreclose federal courts from providing injective relief. *Id*. at 572.

The Agency addresses *Wagner* in a footnote, arguing that this case should not apply because Medley's claims are not meritorious enough and because the harm against him is not irreparable. *See* Dkt. No. 9 at 15, n. 5. The Agency's arguments here do not challenge the validity of this case, but instead obfuscate the fact the case applies here by restating its arguments on completely different issues. The sole issue here is whether Medley has an obligation to administratively exhaust his claims while asking for an injunction to prevent retaliatory actions – *Wagner* states that he does not. *See* 836 F. 2d at 570-71. The Agency's arguments regarding the merit of Medley's claims are addressed elsewhere, as they should be.

Further, the Supreme Court has held that exhaustion under Title VII is not jurisdictional. *Fort Bend County, Texas v. Davis*, No. 18-525 (U.S. June 3, 2019). When Medley requested that the Agency waive his jurisdictional requirements and allow him to litigate his underlying claims in federal court, the Agency refused.

Because Medley is attempting to prevent further retaliatory adverse actions by the Agency through this Motion, he has no obligation to administratively exhaust his claims.

### III. Granting Medley injunctive relief would not harm the Agency and would serve an important public interest.

The Agency's argument that granting Plaintiff's Motion would not serve the public interest and would harm the Agency is undermined by its own insistence that there is no *status quo* to preserve. The Agency simultaneously argues (1) that granting Plaintiff's Motion would force it to reverse course and rehire Medley to the SES and his previous position and (2) that the Court cannot reverse an action that has already been taken. Medley recognizes that he can no longer ask for the Court to reverse his demotion and transfer by the Agency and merely asks for protection against further retaliatory harm by enjoining the Agency from revoking Medley's work-from-home status.

The Agency did not even attempt to argue that allowing Medley to work from home in his new position would be harmful to the Agency or would not serve the public interest. That is because no such argument exists: if the Court enjoined the Agency to preserve the *status quo* of Medley's remote work status, there is no cognizable way in which the Agency could argue that, while most other EEOC workers are remote, keeping one worker permanently remote would somehow disrupt the EEOC's operations enough to harm it or to not serve the public interest. Granting Plaintiff's Motion would therefore serve the public interest without harming the Agency.

## **CONCLUSION**

Despite the arguments raised in the Agency's Opposition to Plaintiff's Motion, the Agency should be restrained from altering the current *status quo* and inflicting further adverse actions until the resolution of Medley's claims. The Court should grant Medley a temporary restraining order and preliminary injunction to restrain the Agency from ordering Medley to report to work in-person until the adjudication of his claims is completed.

Dated: March 15, 2021                             Respectfully Submitted,

*/s/ Anita M. Chambers*
R. Scott Oswald
Anita M. Chambers
The Employment Law Group, P.C.
888 17th Street, 9th Floor
Washington, D.C. 20006
Phone: (202) 261-2806
Facsimile:(202) 261-2835
soswald@employmentlawgroup.com
achambers@employmentlawgroup.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2021, a true and correct copy of the foregoing was served via served via ECF upon:

Diana V. Valdivia
D.C. Bar # 1006628
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 252-2545
diana.valdivia@usdoj.gov

*/s/ Anita M. Chambers*
Anita M. Chambers